**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 25-cr-390-02 (RJL)** |
| | : | |
| **JAMONTAZ MITCHELL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE ORDER OF DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Revoke Order of Detention, ECF Document 18. Simply put, the defendant has not proffered any new facts or circumstances not previously raised at the detention hearing and merely repeats the arguments he made to Magistrate G. Michael Harvey. Indeed, nothing has changed to warrant reconsideration, and as Magistrate Harvey found, the defendant is a danger to the community and should be held pending trial. In support, the United States relies on the following points and authorities and such other points and authorities as may be cited at any hearing on this matter.

**BACKGROUND AND STATEMENT OF FACTS**

As a result of the defendant's role in this fentanyl drug trafficking conspiracy, on December 12, 2025, a federal grand jury sitting in Washington, D.C. indicted the defendant, along with two co-conspirators (Jermaine Wellman and Kourtney Mullen), who were charged in a four-count indictment. The defendant and co-defendant Wellman were indicted in Count One with: Conspiracy to Distribute and Possess with Intent to Distribute 400 Grams or More of a Mixture and Substance Containing Fentanyl and Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), and 846 (Count One); co-defendant Mullen was also charged in Count One with:

Conspiracy to Distribute and Possess with Intent to a Detectable Amount of a Mixture and Substance Containing Fentanyl in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(C). Codefendant Wellman was also charged with: Unlawful Distribution of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (Count Two), and two counts of Unlawful Distribution of Forty Grams or More of Fentanyl and a detectable amount of Methamphetamine (Counts Three and Four).

On six separate occasions between May 2025 and November 2025, co-defendant Wellman, who was supplied by defendant Mitchell, sold large quantities of fentanyl and methamphetamine to a DEA confidential source ("CS"). Only days before his arrest in December of 2025, co-defendant Wellman agreed to provide a DEA undercover ("UC"), who was introduced to co-defendant Wellman by the CS, 2,500 fentanyl pills (approximately 250 grams of fentanyl). Additionally, as more detailed below and based on the investigation, it appears that defendant Mitchell, who assisted co-defendant Wellman during five of the six controlled buys, was co-defendant Wellman's source of supply.

This investigation initially began in February 2024 when the CS provided information to the DEA that co-defendant Wellman was distributing fentanyl pills in the Washington, D.C. area. At the direction of DEA, the CS contacted co-defendant Wellman and arranged to purchase 500 fentanyl pills for $1500 in Northeast Washington, D.C. on March 13, 2024. On March 12, 2024, however, one day before the controlled purchase was to occur, co-defendant Wellman was arrested in Anne Arundel County, Maryland, for charges related to unlawful taking of a motor vehicle, and he remained detained until September 2024. As detailed below, following his release, he continued his drug sales, ultimately selling to the CS on six separate occasions.

Below is a summary chart of the controlled buys:[1]

| **DATE** | **LOCATION** | **COST** | **REQ'D** | **REC'D** | **AMT (grams)** | **LAB** |
|---|---|---|---|---|---|---|
| 5/15/25 (#1) Wellman | Bowie, MD | $400 | 100 pills | 100 pills | 13.09 | fentanyl; methamphetamine; ketamine; caffeine |
| 5/22/25 (#2) Wellman Mitchell | WDC | $2000 | 1000 pills | 559 pills | 59.903 | methamphetamine; ketamine; lidocaine; caffeine |
| 6/6/25 (#3) Wellman Mitchell | WDC | $2500 | 1000 pills | 830 pills | 95.069 | fentanyl; methamphetamine; ketamine; caffeine |
| 7/1/25 (#4) Wellman Mitchell | WDC | $2500 | 1200 pills | 1438 pills | 118.17 | fentanyl; methamphetamine; caffeine; acetaminophen |
| 9/4/25 (#5) Wellman Mitchell | Hanover, MD | $3500 | 1500 pills | 610 pills | 51.388 | fentanyl; ketamine |
| 11/20/25 (#6) Wellman Mitchell | Hanover, MD | $1250 | 500 | 679 pills | 79.46 | fentanyl; ketamine; caffeine; BTMPS; lidocaine |

Additionally, during the course of the fentanyl trafficking conspiracy, from on or about July 21, 2025 to August 1, 2025, while co-defendant Wellman was again in custody on unrelated charges, he solicited co-defendant Kourtney Mullen to supply the CS with 1,200 fentanyl pills in an effort to keep his drug business operational. Co-defendant Mullen reached out to defendant Mitchell in efforts to obtain the fentanyl pills that she would then supply to the CS to further the

[1] Because co-defendant Wellman "shorted" the CS during multiple controlled purchases (and then provided additional pills in other controlled purchases), the summary chart includes both the number of pills requested by the CS ("REQ'D") and the number of pills actually received by the CS from Wellman ("REC'D").

drug business. For unknown reasons, although the agreement was solicited and discussed between co-defendants Wellman and Mullen via numerous recorded calls, which is also corroborated by other evidence, the transaction never occurred. After he was later released from custody, on or about December 9, 2025, co-defendant Wellman agreed to supply a DEA undercover UC with 2,500 fentanyl pills, as detailed below.

**1. <u>May 15, 2025: Controlled Buy #1</u>**

On May 15, 2025, the CS purchased 100 fentanyl pills from co-defendant Wellman for $400 in Bowie, Maryland ("Controlled Buy #1"). Prior to Controlled Buy #1, the CS communicated with co-defendant Wellman via phone call and text. Some of the pertinent text conversations between co-defendant Wellman and the CS read as follows:

**<u>May 15, 2025:</u>**

**CS:** "Yo I just finished court about to drop my kid off be there at 11. Heading towards there bro. I might be 10:45" 9:19 am
**WELLMAN:** "Ok" 10:19 am
**CS:** "Bet see u there Bro" 10:20 am
**WELLMAN:** "Can you come a lil closer bro" 10:22 am
**CS:** "On the phone with my girl 11:15 I be there" 11:03 am

That morning, at approximately 10:40 a.m. co-defendant Wellman called to ask if the CS could meet closer, and the CS agreed to meet co-defendant Wellman at the Safeway parking lot located at 4101 Northview Drive, Bowie, Maryland. At 11:09 a.m., a silver BMW 328i bearing Virginia tags, registered to co-defendant Mullen, parked in the rear remote area of the Safeway parking lot. At approximately 11:10 a.m., co-defendant Wellman advised the CS via FaceTime that he was at the Safeway parking lot in a BMW. Shortly after, co-defendant Wellman got out of co-defendant Mullen's vehicle and stood outside.

At approximately 11:10 a.m., the CS arrived at the Safeway parking lot and parked by co-defendant Mullen's vehicle. Co-defendant Wellman entered the CS's vehicle, where co-defendant Wellman provided the CS 100 blue M-30 fentanyl pills, with a total net weight of 13.09 grams in exchange for $400 during a transaction that was audio/video recorded. Exhibit 1 below includes three photographs from Controlled Buy #1; the first photograph is from law enforcement surveillance showing co-defendant Wellman standing near co-defendant Mullen's BMW in the Safeway parking lot; the middle photograph is from law enforcement surveillance showing co-defendant Wellman meeting with the CS in the Safeway parking lot; and the third photograph is from surveillance video showing co-defendant Wellman receiving the DEA funds from the CS after providing the CS 100 fentanyl pills.

**Exhibit 1**



Exhibit 2 below is a photograph of the 100 fentanyl pills co-defendant Wellman provided the CS that day, along with the DEA laboratory analysis memorializing that the drugs provided contained 13.09 grams of fentanyl and other substances.

**Exhibit 2**




U.S. Department of Justice
Drug Enforcement Administration

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Washington Division Office
801 I Street N.W. , Suite 500
Washington, DC 20001

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-02809

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 1 | N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl) | 13.09 g ± 0.01 g | ---- | ---- |
| 1 | Methamphetamine | | ---- | ---- |
| 1 | Ketamine | | ---- | ---- |
| 1 | Caffeine | | ---- | ---- |
| 1 | Acetaminophen | | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Total dosage unit count = 100 tablets (net); 81.5 tablets (reserve)

Fentanyl purity not determined due to the suspected low-level of the substance present and limitations of the testing performed.

**Exhibit Details:**

**Date Accepted by Laboratory:** 05/15/2025 **Gross Weight:** 43.9 g **Date Received by Examiner:** 05/15/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 1 | 100 | Plastic Bag | Tablet | 10.67 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Fentanyl, methamphetamine, ketamine, caffeine and acetaminophen identified in 9 units tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substances. A composite was formed from 60 units for further testing.

| Exhibit | Summary of Test(s) |
|---|---|
| 1 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

2. **<u>May 22, 2025: Controlled Buy #2</u>**

On May 22, 2025, after co-defendant Wellman agreed to sell the CS 1,000 fentanyl pills for $2,000,[2] the CS conducted a controlled purchase with co-defendant Wellman in a Costco parking lot located at 2441 Market Street NE, Washington, D.C. ("Controlled Buy #2"). As they had done prior to Controlled Buy #1, the CS and co-defendant Wellman communicated via phone

[2] Although the controlled drug transaction was supposed to be for 1,000 fentanyl pills for $2,000, there was confusion between co-defendant Wellman and the CS on the price per pill, and they settled on 800 pills for $2,000. As detailed *infra*, final laboratory testing determined that, notwithstanding the agreement, co-defendant Wellman actually sold the CS 559 pills containing methamphetamine, ketamine, caffeine, and lidocaine.

to coordinate the drug transaction. Some of the pertinent text conversations between co-defendant Wellman and the CS prior to the transaction read as follows:

**May 20, 2025:**

**CS:** "Yo" 4:15 pm
**WELLMAN:** "Hit you right back" 4:15 pm
**CS:** "We good" 4:15 pm
**WELLMAN:** "Yea he said 2.50 he not trying come down nomore I been trying get him to atleat 2.25 been trying get it down for you" 4:19 pm
**CS:** "Ok give me. Few. I got 2K for this play this week. We good for 800 blues at 2k???" 4:19 & 4:36 pm
**WELLMAN:** "Ok yea we good" 4:58 pm
**CS:** "That's a bet. Let's rock Thursday 11a at Costco 2441 Market St NE no change up Bro or last min" 5:03 pm
**WELLMAN:** "Ok bet. At the hospital right now my bad bro" 8:06 pm
**CS:** "Damn bro u good" 8:06 pm
**WELLMAN:** "That just found a tumor in my brother 6 year old son head" 8:07 pm
**CS:** "Oh fuck man. Prayers bro" 8:08 pm
**WELLMAN:** "Thanks bro I appreciate that *100 emoji*" 8:09 pm
**CS:** "Always bro see u Thursday bro" 8:10 pm
**WELLMAN:** "Ok bet" 8:11 pm

On May 22, 2025, at approximately 7:17 a.m., before the controlled purchase, law enforcement conducted unbroken surveillance of co-defendant Wellman, co-defendant Mullen, and a juvenile as they entered Mullen's BMW, which was parked outside of their residence at 1429 Montpelier Street, Baltimore, Maryland. After making other stops, during which co-defendant Mullen and the juvenile exited the vehicle, at approximately 9:51 a.m., the BMW arrived at the NYC Grocery Tobacco 1 shop, located at 2704 W. Cold Spring Lane, Baltimore, Maryland. Co-defendant Wellman got out of the vehicle and entered the store briefly before coming back out with defendant Mitchell. Both defendants entered the BMW, which traveled to the Costco in NE, Washington, D.C., where co-defendant Wellman had agreed to meet with the CS. Again, law enforcement conducted unbroken surveillance of the BMW en route to the meeting location.

The CS and co-defendant Wellman continued to communicate by phone that day to coordinate the controlled purchase. Some of the pertinent text conversations between the two prior to their meeting read as follows:

**<u>May 22, 2025:</u>**

**WELLMAN:** "What time you be there. I'm 20 minutes away" 10:34 am
**CS:** "11. Maybe earlier" 10:34 am
**WELLMAN:** "Ok. Here" 10:56 am
**CS:** "Ok drop my girl off 8-10 min Bri. Bro" 10:58 am
**WELLMAN:** "Ok"
**CS:** "2 min bro white Hyundai" 11:01 am
**WELLMAN:** "I'm park towards the Starbucks" 11:03 am

At approximately 11:05 a.m., co-defendant Wellman, with defendant Mitchell in the passenger seat, pulled up and parked next to the CS's vehicle. Co-defendant Wellman got out and entered the CS's vehicle, where he provided the CS with 559 blue M-30 fentanyl pills, later determined to be 59.9 grams of methamphetamine (although the agreement was for fentanyl) in exchange for $2,000 during a transaction that was audio and video recorded. After the controlled purchase, co-defendant Wellman reentered the BMW, which traveled back to the NYC Grocery Tobacco 1 shop in Baltimore, where defendant Mitchell was observed by law enforcement exit the vehicle. Exhibit 3 below includes four photographs taken by law enforcement prior to Controlled Buy #2 of co-defendants Wellman and Mitchell meeting before traveling to the Controlled Buy #2.

**Exhibit #3**




Exhibit 4 below includes two photographs taken from law enforcement surveillance conducted during Controlled Buy #2. The first photograph shows co-defendant Mullen's BMW with both defendants Wellman and Mitchell seated inside, and the second photograph is of co-defendant Wellman counting DEA proceeds from Controlled Buy #2 inside the CS's vehicle.

**Exhibit #4**




Exhibit #5 below depicts law enforcement surveillance documenting unbroken surveillance from the meeting location to Baltimore, where co-defendant Wellman dropped defendant Mitchell back off at the gas station.

**Exhibit #5**




Exhibit #6 below depicts the laboratory analysis for the 559 pills co-defendant Wellman supplied the CS, determined to contain 59.9 grams of methamphetamine and other substances.

**Exhibit #6**

May 22, 2025 – CS purchase of 559 pills for $2,000



U.S. Department of Justice
Drug Enforcement Administration

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Washington Division Office
801 I Street N.W. , Suite 500
Washington, DC 20001

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-03015

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 2 | Ketamine | 59.903 g ± 0.002 g | ---- | ---- |
| 2 | Methamphetamine | | ---- | ---- |
| 2 | Caffeine | | ---- | ---- |
| 2 | Lidocaine | | ---- | ---- |

**Remarks:**
The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Total dosage unit count = 559 Tablets (net); 552 Tablets (reserve).

Total number of units is an extrapolated value.

**Exhibit Details:**

**Date Accepted by Laboratory:** 05/27/2025 **Gross Weight:** 104.7 g **Date Received by Examiner:** 06/04/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 2 | 559 | Plastic Bag | Tablet | 59.085 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Ketamine identified in 9 unit(s) tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance(s). Methamphetamine also identified in 3 unit(s) tested. Caffeine and Lidocaine also identified in the exhibit.

| Exhibit | Summary of Test(s) |
|---|---|
| 2 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

**3. <u>June 6, 2025: Controlled Buy #3</u>**

On June 2, 2025, after co-defendant Wellman agreed to sell the CS 1,000 fentanyl pills for $2,500,[3] the CS conducted a controlled purchase with co-defendant Wellman, who was again accompanied to the buy location with defendant Mitchell, in a Lowes parking lot located at 2438 Market Street NE, Washington, DC ("Controlled Buy #3"). As with previous controlled purchases, the CS and co-defendant Wellman communicated by phone to coordinate the drug transaction. Some of the pertinent text conversations between co-defendant Wellman and the CS read as follows:

**<u>June 2, 2025:</u>**

**WELLMAN:** *Sent the CS an audio message* - "Yo my man's said he, he, he spiked them up as much as he can for you, feel me? Took 'em up a little bit more. But he said two-fifty

[3] Although co-defendant Wellman agreed to sell the CS 1,000 fentanyl pills for $2,500, as detailed *infra*, final laboratory testing determined that co-defendant Wellman sold the CS 830 fentanyl pills.

bro ($2.50). I been tryin go other places and everybody else been trying to charge a muhfucka three ($3.00) or better. So it's like, I been negotiating and shit all day but that shit ain't, that shit ain't working for real" 6:48 pm
**CS:** "Aight I will talk to my man" 6:49 pm
**CS:** "My N***** said we're good for the 1k blues @2500. U get a number on the other joint we talked bout?" (Referring to a previously mentioned firearm with a switch for sale) 6:56 pm
**WELLMAN:** "Ok. And ima keep you posted give me a sec" 7:10 PM
**CS:** "Bet" 7:10 pm

Controlled Buy #3, which was supposed to be 1,000 fentanyl pills for $2,500, was originally scheduled to occur on June 5, 2025. That day prior to the scheduled controlled purchase, law enforcement conducted surveillance of co-defendant Wellman and co-defendant Mullen as they drove in co-defendant Mullen's BMW. The defendants apparently noticed law enforcement following them and pulled over. Co-defendant Wellman then called Laurel Police Department to report that someone was following them. Shortly thereafter, co-defendant Wellman called the CS to cancel Controlled Buy #3; undeterred, however, co-defendant Wellman later reached out to the CS and rescheduled Controlled Buy #3 for the next day, June 6, 2025.

On June 6, 2025, prior to Controlled Buy #3, the GPS data for Mullen's BMW and both defendants Wellman and Mitchell's cellular telephones placed them in the same area in Baltimore Maryland. Later that morning, co-defendant Wellman and the CS continued communicating regarding Controlled Buy #3. The following is a synopsis of the recorded telephone conversation between co-defendant Wellman and the CS at approximately 10:57 a.m.:

**CS**: "Yo"
**WELLMAN**: "Yeah?"
**CS**: "Alright, I'm heading that way right now bro, I just got my other car. That fuckin piece of shit just died on me in the middle of the road bro"
**WELLMAN**: "Alright, you good"
**CS**: "Huh?"
**WELLMAN**: "I said you good"
**CS**: "Yeah, I got my other car. I got my Nissan. I'm driving this piece of shit. Bruh the car was fine man I have that bitch sold today. That's why I want to bring it out there cuz I was

going to take it to DC and drop the motherfucker off. So I was goin knock two birds out with one stone"
**WELLMAN**: "What's wrong with it?"
**CS**: "The fuckin engine went bad"
**WELLMAN**: *Unrecognizable transmission*
**CS**: "Dead ass engine locked up up on me"
**WELLMAN**: *Unrecognizable transmission*
**CS**: "Yup. But I'll be there. Just wait for me there bruh, I'll be there. How long? You there already?"
**WELLMAN**: "I'll be there in like five, ten minutes"
**CS**: "Alright give me like fifteen, twenty. I'll be there"
**WELLMAN**: *Unclear transmission*
**CS**: "Alright"

At approximately 11:25 a.m., co-defendant Wellman advised the CS that he was already at the Lowes parking lot where Controlled Buy #3 was to take place. At approximately 11:27 a.m., a grey Jeep Cherokee SUV bearing a Georgia temporary tag parked in the back area along a bush line within the Lowes parking lot. At approximately 11:30 a.m., co-defendant Wellman briefly exited the grey Jeep before re-entering the vehicle. GPS data from defendants Wellman and Mithell's cellular telephone placed their devices reasonably close to the Lowes parking lot.

At approximately 11:33 a.m., the CS arrived at the Lowes parking lot and parked a couple of parking spots away from the grey Jeep. Co-defendant Wellman exited the grey Jeep and walked over to the CS's vehicle, where he got in. As seen in Exhibits #7 and #8 below, during a transaction that was audio and video recorded, co-defendant Wellman sold the CS 830 fentanyl pills weighing 95.0 grams of fentanyl, methamphetamine, ketamine, and caffeine (as noted above, co-defendant Wellman was supposed to provide 1,000 fentanyl pills).

At approximately 11:36 a.m., co-defendant Wellman exited the CS's vehicle and reentered the grey Jeep's rear passenger's side door. As the grey Jeep pulled away from its parking spot, law enforcement identified defendant Mitchell as the front passenger and the driver as defendant Mitchell's girlfriend (*see* Exhibit #9 below).

**Exhibit #7**




**Exhibit #8**




U.S. Department of Justice
Drug Enforcement Administration

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Greenbelt HIDTA TFG
9001 Edmonston Road, Room 430
Greenbelt, MD 20770

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-03284

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 3 | Methamphetamine | 95.069 g ± 0.007 g | ---- | ---- |
| 3 | N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl) | | ---- | ---- |
| 3 | Ketamine | | ---- | ---- |
| 3 | Caffeine | | ---- | ---- |

**Remarks:**

The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Fentanyl purity not determined due to the suspected low-level of the substance present and limitations of the testing performed.

Total dosage unit count = 830 tablets (net); 822 tablets (reserve).

Total number of units is an extrapolated value.

**Exhibit Details:**

**Date Accepted by Laboratory:** 06/09/2025 **Gross Weight:** 126.3 g **Date Received by Examiner:** 06/18/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 3 | 830 | Plastic Bag | Tablet | 94.185 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Methamphetamine, Fentanyl, and Ketamine identified in 9 unit(s) tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance(s). Caffeine also identified in the exhibit.

| Exhibit | Summary of Test(s) |
|---|---|
| 3 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

**Exhibit #9**

June 6, 2025 – Controlled Buy #3 Post Surveillance Photos



- ❖ Mother of Mitchell's son drove Mitchell and Wellman to the deal with the CS
- ❖ Both Wellman's and Mitchell's cellular GPS data, showed them to be in the same area before, during, and after the deal with the CS (From Baltimore, to Washington, DC, and then back to Baltimore)

**4. <u>July 1, 2025: Controlled Buy #4</u>**

On July 1, 2025, the CS conducted a controlled purchase of 1,438 fentanyl pills for $2,500[4] with co-defendant Wellman in the Lowe's parking lot located at 2438 Market Street NE, Washington, D.C. As part of the transaction, co-defendant Wellman agreed to add on an extra 200 fentanyl pills because he had shorted the CS 170 pills during Controlled Purchase #3. As with the prior purchases, the CS and co-defendant Wellman communicated by telephone to coordinate the drug transaction. On June 30, 2025, at approximately 8:10 p.m., co-defendant Wellman and the CS had the following discussion:

> **CS:** "You down for tomorrow?"
> **WELLMAN:** "Yeah, what time?"
> **CS:** "11. So remember you. I gotta..."

---

[4] Co-defendant Wellman agreed to sell the CS 1,200 fentanyl pills for $2,500 to account for the prior controlled purchase in which he shorted the CS. Final laboratory testing determined that co-defendant Wellman sold the CS 1,438 pills containing fentanyl.

**WELLMAN:** "You can meet, you can meet me, you can meet me a little closer?"
**CS:** "Uhhh"
**WELLMAN:** "If, if not it's cool. If not it's cool"
**CS:** "Only reason why I say that because you know uhm, I already told the nigga I was going to meet him there tomorrow so. At where he's at"
**WELLMAN:** "Alright"
**CS:** "But tell me this"
**WELLMAN:** "You said eleven (11) exactly?"
**CS:** "Eleven (11) exactly. You, you got the one eighty-nine (189) you owe me right?"
**WELLMAN:** "Yeah, yeah. So, so twelve hundred (1,200) all together?"
**CS:** "Exactly, twelve hundred (1,200) all together yup. And I, and I got the money for you ready"
**WELLMAN:** "I got you"

On July 1, 2025, at approximately 8:27 a.m., defendant Mitchell exited a residence in Baltimore associated with him and entered the grey Jeep before driving to the NYC Grocery Tobacco 1 shop located at 2704 W Cold Spring Lane Baltimore, Maryland. As noted above, this is the same location where co-defendant Wellman picked him up and dropped him off before and after traveling to Washington, D.C. for Controlled Purchase #2 on May 22, 2025. At approximately 10:32 a.m., defendant Mitchell met co-defendant Wellman, who was operating co-defendant Mullen's BMW in the 1500 block of Russell Street, Baltimore, Maryland and got into the vehicle. Exhibit 10 below depicts law enforcement's unbroken surveillance of the BMW to Controlled Buy #4.

**Exhibit #10**

## July 1, 2025 – Controlled Buy #4 Surveillance Photos of Jermaine Wellman and Jamontaz Mitchell





- ❖ Mitchell was observed on the 2700 block of W Cold Spring Lane, Baltimore, MD 21215 between approx. 8:30 am – 8:40 am
- ❖ Wellman picked Mitchell up from the 1500 block of Russell Street, Baltimore, MD 21230 at approx. 10:30 am before meeting the CS

Once at the Lowes parking lot, defendant Mitchell exited the BMW operated by co-defendant Wellman, and in an apparent effort to further distance himself from the drug transaction, walked into a nearby store. At approximately 11:05 a.m., the CS and co-defendant Wellman met and conducted Controlled Buy #4. Although co-defendant Wellman would not enter the CS's vehicle because he was concerned about law enforcement presence in the area, he was undeterred from completing Controlled Buy #4 and handed the CS 1,438 fentanyl pills in exchange for $2,500. Even though co-defendant Wellman's face was not captured on the surveillance video during the controlled buy his voice was captured and he was also observed outside the CS's vehicle during the controlled buy (*see* Exhibit 11).

**Exhibit 11**




Shortly after Controlled Buy #4, defendants Wellman and Mitchell both re-entered the BMW and drove to a parking lot, located at 1525 Russell Street, Baltimore, Maryland. A few hours after Controlled Buy #4, defendant Mitchell posted on his Instagram account ("jackboymoney") a photograph of U.S. Currency in similar denominations as the CS provided co-defendant Wellman during Controlled Buy #4 (*see* Exhibit 12).

**Exhibit 12**




Exhibit 13 shows the laboratory analysis for the 1,438 fentanyl pills sold by co-defendant Wellman, which was determined to contain 118 grams of fentanyl and other substances.

**Exhibit 13**

July 1, 2025 – CS purchase of 1,438 fentanyl pills for $2,500





U.S. Department of Justice
Drug Enforcement Administration

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Washington Division Office
801 I Street N.W. , Suite 500
Washington, DC 20001

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-03717

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 4 | Ketamine | 118.17 g ± 0.01 g | ---- | ---- |
| 4 | N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl) | | ---- | ---- |
| 4 | Caffeine | | ---- | ---- |
| 4 | Acetaminophen | | ---- | ---- |

**Remarks:**
The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Fentanyl purity not determined due to the suspected low-level of the substance present and limitations of the testing performed.

Total dosage unit count = 1438 tablets (net); 1428 tablets (reserve)

Total number of units is an extrapolated value.

**Exhibit Details:**

**Date Accepted by Laboratory:** 07/02/2025 **Gross Weight:** 152.1 g **Date Received by Examiner:** 07/10/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 4 | 1438 | Plastic Bag | Tablet | 117.33 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Ketamine and fentanyl identified in 9 units tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substances. Caffeine and acetaminophen also identified in the exhibit.

| Exhibit | Summary of Test(s) |
|---|---|
| 4 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

**4A. <u>July 21, 2025 – August 1 2025: Wellman and Mullen attempt to obtain fentanyl pills from Mitchell</u>**

On or about July 15, 2025, co-defendant Wellman[5] was arrested on unrelated charges and, while in custody, had multiple calls with co-defendant Mullen using a recorded line in the Ann Arundel Detention Facility. During a July 21, 2025 jail call, the following conversation occurred between co-defendants Wellman and Mullen:

> **WELLMAN:** "DM (Direct Message) him"
> **MULLEN:** "You said DM (Direct Message) him? "
> **WELLMAN:** "Yeah. Just say hey, this Mack's girl, he had turned himself in on for a dumb ass traffic charge. Just tell him everything, everything. Tell him if he need him, he can just meet you. You, did it? You, did it?"
> **MULLEN:** "Yeah"
> **WELLMAN:** "Alright".

---

5 In the government's detention memo (ECF Document 13), the government made a scriveners error noting that "Mitchell was arrested," when it should have read Wellman was arrested. *See* Attachment 1, a copy of co-defendant Wellman's Ann Arundel County Detention Center (AACDC) custody report noting that co-defendant Wellman was in AADC from July 16, 2025, to August 28, 2025.

Shortly thereafter, co-defendant Mullen reached out to the CS via social media and offered to supply the CS with fentanyl on behalf of co-defendant Wellman (*see* Exhibit 14).

**Exhibit 14**




Through a series of jail calls between July 21, 2025 and August 1, 2025 and communications with the CS, co-defendant Mullen negotiated a 1,200 fentanyl pill deal on behalf of co-defendant Wellman and reached out to defendant Mitchell in efforts to source the fentanyl.

For instance, on July 31, 2025, co-defendant Mullen told co-defendant Wellman that defendant Mitchell (Money)[6] will go with her to the August 1, 2025, 1,200 fentanyl pill deal with the CS:

> **WELLMAN:** "What're you doing?"
> **MULLEN:** "I talked to him. Now, I got another issue. Basically, I'm just overthinking it"
> **WELLMAN:** "Huh?"
> **MULLEN:** "I'm just overthinking it"
> **WELLMAN:** "Why? What's wrong?"
> **MULLEN:** "**Money** said, yeah, ride with me tomorrow morning or whatever"
> **WELLMAN:** "I can't hear you"
> **MULLEN:** "I said, **Money** said, yo, ride with me tomorrow morning"
> **WELLMAN:** "Oh, you talked to **Money**?"
> **MULLEN:** "Yeah"
> **WELLMAN:** "Alright… What happened?"
> **MULLEN:** "He said he'll ride with me tomorrow morning or whatever. But I just don't know him to just ride that long ride with just him. So, I told Tev I was going to tell him to go with me but I don't know if he goin be able to"
> **WELLMAN:** "I mean. What time?"
> **MULLEN:** "8, 8 in the morning. I gotta meet, I gotta meet yo at 8 am".

This drug transaction never occurred, and co-defendant Mullen stopped reaching out to the CS.

During the negotiations that occurred in efforts to provide the CS 1,200 fentanyl pills, co-defendant Mullen reached out to defendant Mitchell on at least four occasions as evidenced by toll records below (*see* Exhibit 15).

[6] Through the investigation, it was learned that defendant Mitchell's nicknames include "Jackboymoney" and "money."

**Exhibit 15**

| Target | Target (Raw) | Provider Date | Provider Time | Provider Time Zone | Date | Time | Duration | Direction | Contact ID | Contact ID (Raw) | Contact Name | File Title | Received Target |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (301) 913-4115 | 3019134115 | 07/31/2025 | 22:23:43 | UTC+00:00 | 07/31/2025 | 18:23:43 | 00:00:03 | Incoming | (667) 379-8895 | 6673798895 | JAMONTAZ MITCHELL | WELLMAN, JERMAINE | (301) 913-4115 |
| (301) 913-4115 | 3019134115 | 07/31/2025 | 22:23:55 | UTC+00:00 | 07/31/2025 | 18:23:55 | 00:00:48 | Outgoing | (667) 379-8895 | 6673798895 | JAMONTAZ MITCHELL | WELLMAN, JERMAINE | (301) 913-4115 |
| (301) 913-4115 | 3019134115 | 08/01/2025 | 00:41:41 | UTC+00:00 | 07/31/2025 | 20:41:41 | 00:00:00 | Outgoing | (667) 379-8895 | 16673798895 | JAMONTAZ MITCHELL | WELLMAN, JERMAINE | (301) 913-4115 |
| (301) 913-4115 | 3019134115 | 08/01/2025 | 01:19:41 | UTC+00:00 | 07/31/2025 | 21:19:41 | 00:00:04 | Outgoing | (667) 379-8895 | 6673798895 | JAMONTAZ MITCHELL | WELLMAN, JERMAINE | (301) 913-4115 |

On August 28, 2025, co-defendant Wellman was released from custody and almost immediately reached out to the CS to continue supplying him with fentanyl.

### 5. <u>September 4, 2025: Controlled Buy #5</u>

On August 29, 2025, co-defendant Wellman contacted the CS advising that he was recently released from jail. On September 4, 2025, after co-defendant Wellman agreed to sell the CS 1,500 fentanyl pills for $3,500,[7] the CS conducted a controlled purchase with co-defendant Wellman in the Burlington clothing store parking lot located at 7000 Arundel Mills Circle, Hanover, Maryland ("Controlled Buy #5").

On September 4, 2025, at approximately 10:30 a.m., prior to Controlled Buy #5, law enforcement conducting surveillance observed co-defendant Wellman, operating the BMW, meet with defendant Mitchell, who was operating the grey Jeep, at a BP gas station located at 2000 Haines Street, Baltimore, Maryland. Shortly after the meeting, law enforcement followed both vehicles which traveled separately from BP gas station to the above-mentioned Burlington clothing store (*see* Exhibit 16).

[7] Although co-defendant Wellman agreed to sell the CS 1,500 fentanyl pills for $3,500, as detailed *infra*, final laboratory testing determined that co-defendant Wellman sold the CS 610 pills containing fentanyl.

**Exhibit 16**

September 4, 2025 – Controlled Buy #5 Pre Surveillance Photos of Jermaine Wellman and Jamontaz Mitchell






- Wellman and Mitchell met at 2000 Haines Street, Baltimore, MD 21230 before meeting with the CS




At approximately 10:40 a.m., the CS arrived at the Burlington clothing store parking lot. At approximately 10:55 a.m., co-defendant Wellman, operating the BMW, and defendant Mitchell, operating the grey Jeep, pulled into the parking lot while traveling in tandem. Upon arriving, both vehicles circled the lot several times in a manner consistent with conducting countersurveillance in efforts to attempt to detect law enforcement personnel. Shortly thereafter, co-defendant Wellman parked the BMW next to the CS's vehicle. At that same time, defendant Mitchell parked the grey Jeep two aisles behind the BMW and the CS's vehicle. During the video recorded fentanyl drug transaction, co-defendant Wellman can be seen handing a bag to the CS, and then counting money provided to co-defendant Wellman from the CS. Additionally, during the controlled buy, co-defendant Wellman said to the CS that his supplier "is sitting right there . . . I ready to give him his money…" (*see* Exhibit 17). Thereafter, co-defendant Wellman met with defendant Mitchell in the parking lot – presumably to provide him the drug proceeds for the fentanyl defendant

Mitchell provided co-defendant Wellman, who then provided the fentanyl to the CS (*see* Exhibit 17).

**Exhibit 17**




As noted above, co-defendant Wellman only provided 610 fentanyl pills for $3,500, which laboratory analysis confirmed as 51 grams of fentanyl and other substances (*see* Exhibit 18).

**Exhibit 18**

September 4, 2025 – CS purchase of 610 fentanyl pills for $3,500



U.S. Department of Justice
Drug Enforcement Administration

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Washington Division Office
801 I Street N.W. , Suite 500
Washington, DC 20001

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-05114

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 5 | Ketamine | 51.388 g ± 0.002 g | ---- | ---- |
| 5 | N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl) | | ---- | ---- |

**Remarks:**
The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Fentanyl purity not determined due to the suspected low-level of the substance present and limitations of the testing performed.

Total dosage unit count = 610 tablets (net); 605 tablets (reserve).

Total number of units is an extrapolated value.

**Exhibit Details:**

**Date Accepted by Laboratory:** 09/05/2025 **Gross Weight:** 156.0 g **Date Received by Examiner:** 09/30/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 5 | 610 | Plastic Bag | Tablet | 50.992 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**

Ketamine and Fentanyl identified in 9 unit(s) tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance(s).

| Exhibit | Summary of Test(s) |
|---|---|
| 5 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

On September 18, 2025, the CS complained to co-defendant Wellman about not providing him the full amount of fentanyl pills agreed upon. Co-defendant Wellman then reached out to defendant Mitchell via Instagram (jackboymoney) indicating that they needed to provide the CS the additional fentanyl pills and stating, "we got to make that right." Defendant Mitchell then responded, "You gotta see him tomorrow . . . We can sit in count them together." Co-defendant Wellman then responded, "Nah I got give him what I owe him first." *See* Exhibit 19.

**Exhibit 19**







6. **November 20, 2025: Controlled Buy #6**

On November 20, 2025, the CS conducted another controlled purchase of 679 fentanyl pills from co-defendant Wellman for $1,250 in the Burlington clothing store parking lot located at 7000 Arundel Mills Circle, Hanover, Maryland ("Controlled Buy #6"). As with the prior conversations, the CS and co-defendant Wellman communicated prior to the controlled purchase to coordinate.

At approximately 10:48 a.m., the CS arrived at the parking lot of the Burlington clothing store. At approximately 10:50 a.m., co-defendant Wellman contacted the CS via FaceTime, stating he was almost at the Arundel Mills shopping center and advising that he was waiting for his "man"

to come drop off the fentanyl pills. At approximately 11:00 a.m., co-defendant Mullen's BMW pulled into and parked in the Burlington parking lot but did not initially park near the CS's vehicle. Law enforcement was present in the parking lot. Co-defendant Wellman did not advise the CS that he had arrived at the Burlington parking lot upon his arrival.

At approximately 11:34 a.m., co-defendant Wellman drove the BMW from the Burlington parking lot to the Olive Garden parking lot, located at 7092 Arundel Mills Circle, Hanover, Maryland. While the BMW was parked in the Olive Garden parking lot, a Gold 2004 Toyota Sienna, registered to a family member of defendant Mitchell's girlfriend and being operated by defendant Mitchell's brother with defendant Mitchell in the passenger seat, pulled in and parked one parking aisle behind the BMW. At approximately 11:42 a.m., defendant Mitchell exited the front passenger door of Sienna and briefly entered the BMW before returning to the Sienna. Moments after, the BMW and the Sienna drove in tandem from the Olive Garden parking lot to the Burlington clothing store parking lot where the CS was parked (*see* Exhibit 20).

**Exhibit 20**



At approximately 11:45 a.m., the BMW parked on the passenger's side of the CS's vehicle, and co-defendant Wellman met with the CS. At that same time, the Sienna parked approximately two parking aisles behind the CS and BMW (see Exhibit 21).

**Exhibit 21**




At that time, co-defendant Wellman provided the CS 679 fentanyl pills, which laboratory analysis later determined to be 79 grams of fentanyl and other substances, for $1,250 (*see* Exhibit 22 and 23).

**Exhibit 22**

November 20, 2025 – Controlled Buy #6 Surveillance Video/Audio




**Exhibit 23**

November 20, 2025 – CS purchase of 679 fentanyl pills for $1,250





**U.S. Department of Justice**
**Drug Enforcement Administration**

Mid-Atlantic Laboratory
Largo, MD

**Chemical Analysis Report**

Washington Division Office
801 I Street N.W. , Suite 500
Washington, DC 20001

**Case Number:** GD-25-0069
**LIMS Number:** 2025-SFL3-06968

**Observations, Results and Conclusions:**

| Exhibit | Substance(s) Identified | Net Weight | Substance Purity | Amount Pure Substance |
|---|---|---|---|---|
| 6 | N-Phenyl-N-[1-(2-phenylethyl) -4-piperidinyl]propanamide (Fentanyl) | 79.46 g ± 0.01 g | ---- | ---- |
| 6 | Ketamine | | ---- | ---- |
| 6 | Caffeine | | ---- | ---- |
| 6 | Bis(2,2,6,6-tetramethyl-4-piperidyl) Sebacate (BTMPS) | | ---- | ---- |
| 6 | Lidocaine | | ---- | ---- |

**Remarks:**
The net weight represents the weight of all material, excluding the packaging.

The net weight was determined by direct weighing of all unit(s). The net weight uncertainty value represents an expanded uncertainty estimate at the 95% level of confidence.

Total dosage unit count = 679 Tablets (net); 666 Tablets (reserve).

Fentanyl purity not determined due to the suspected low-level of the substance present and limitations of the testing performed.

**Exhibit Details:**

**Date Accepted by Laboratory:** 11/20/2025 **Gross Weight:** 124.4 g **Date Received by Examiner:** 11/20/2025

| Exhibit | No. Units | Pkg. (Inner) | Form | Reserve Wt. |
|---|---|---|---|---|
| 6 | 679 | Ziplock Plastic Bag | Tablet | 77.96 g |

**Remarks:**

**Exhibit Analysis:**

**Sampling:**
Caffeine identified in 9 unit(s) tested indicating, to at least a 95% level of confidence, that at least 70% of the units in the population contain the substance(s). A composite was formed from 15 units for further testing. Fentanyl, Ketamine, BTMPS, and Lidocaine confirmed in the composite.

| Exhibit | Summary of Test(s) |
|---|---|
| 6 | Gas Chromatography, Gas Chromatography/Mass Spectrometry |

On December 9, 2025, co-defendant Wellman and the CS discussed co-defendant Wellman providing the CS fentanyl on behalf of the CS's associate (unbeknownst to him, a DEA undercover officer ("UC")). Co-defendant Wellman said, "Ima hit him," an apparent reference to co-defendant Wellman reaching out to defendant Mitchell to supply the 2,500 fentanyl pills. This conversation occurred via FaceTime, as co-defendant Wellman was wary of law enforcement (*see* Exhibit 24).

**Exhibit 24**




On December 15, 2025, the day before the defendants were arrested on outstanding arrest warrants, co-defendant Wellman, the CS, and the DEA UC spoke about the 2,500 fentanyl pill deal. Co-defendant Wellman agreed to supply the DEA UC the 2,500 fentanyl pills on December 16, 2025, and to conduct future transactions.

## APPLICABLE LAW

First, the defendant has not raised any new facts or circumstances warranting disturbing

Magistrate Harvey's Detention Order, ECF Document 17. As Magistrate Harvey noted in his Detention Order:

> Defendant requested that the Court release him subject to strict conditions, including home incarceration, and the supervision of his brother as a potential third-party custodian. Defendant argued that law enforcement did not recover any firearms during searches of the residence the government associated with him. This absence undermines any contention that Defendant served as armed protection or played a violent role in the alleged conduct. Further, Defendant argued that the government's theory that he was the source of the drugs or a key participant in the trafficking was speculative and rested on assumptions rather than direct evidence.

*Id*. at 5.

Magistrate Harvey concluded that:

> Finally, the Court finds that Defendant poses a real and ongoing danger to the community. The charged conduct involves the large-scale distribution of fentanyl, a substance with devastating effects on public safety. More, based on Defendant's alleged conduct over many months, the strength of the government's evidence, and Defendant's criminal history, the Court concludes that release would present an unacceptable risk that Defendant would continue to engage in the same conduct alleged in the Indictment. The Court is not persuaded that any condition or combination of conditions would reasonably mitigate this danger. Accordingly, this factor weighs in favor of detention.
>
> The Court concludes that Defendant failed to rebut the presumption of detention as to dangerousness. The Court also concludes that, even if he had, the government has demonstrated by clear and convincing evidence that Defendant's release would pose a danger to the community that no combination of release conditions could reasonably mitigate. Defendant is ordered detained pending trial in this matter.

*Id.* at 7. Nothing has changed since the detention hearing other than the defendant now has a detainer lodged against him for violating his probation Baltimore City, Maryland Case Docket 120204007, *see* Attachment 2, attached.

Lastly, the defendant argues that that any reference to the defendant's conviction for gang, drug, and firearms in Baltimore City Circuit Court Case 120204007 "is weak, at best." ECF Document 18 at 9. Despite this assertion, however, the Pretrial Services Report (PSR) clearly

outlines that the defendant has a conviction for "Participate Criminal Gang, Con-Part Criminal Gang, Poss of Firearm, received a custodial sentence, and was on probation at the time of this offense," PSR at 3.[8] Further, a review of the 30-count speaking indictment in that case clearly outlines the defendant's participation in a criminal drug (including fentanyl) trafficking and firearms criminal enterprise, *see* Attachment 3. Paragraphs 56, 58-60, 71-73, and 78 specifically outline the defendant's role in the drug trafficking and firearms conspiracy. On or about December 21, 2022, the defendant pled guilty to Participation in a Criminal Gang; Participation in Criminal Gang – Conspiracy; and Possession of a Firearm and was later sentenced to five years imprisonment, with two years seven months and one day suspended.

The defendant also received three years of probation – probation he was still on at the time of the instant offense. Because he was still on probation, on December 18, 2025, a request for a warrant and to lodge a detainer was issued, *see* Attachment 2. Therefore, even if the Court were to release the defendant in this case, he will be held on his probation violation in the 2020 conviction.

The Bail Reform Act requires pretrial detention where a court finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(e). Here, the defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(C) (drug offense with a maximum sentence of 10 years or more). Indeed, there is a rebuttable presumption in favor of detention under § 3142(e)(3)(A). The government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir.

[8] Attached is a link to a news story regarding the defendant's 2020 arrest and charge: https://www.wbaltv.com/article/19-indicted-baltimore-drug-trafficking-possibly-linked-to-killing-of-gerald-brown/34240041

1988)).

In considering whether there are conditions of release which will reasonably assure the safety of any other person and the community and the appearance of the defendants as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. 3142(g). In consideration of these factors, the United States respectfully submits that there is no condition, or combination of conditions, that would assure the safety of the community if the defendant was released.

The defendant's conduct here was not a one-time criminal event, nor was it the result of isolated, aberrational behavior. On the contrary, these crimes were the result of concerted action over a period of time, requiring planning, thought, and reflection in a manner that demonstrates that the defendant had absolutely no concern for the harm to the community but was instead driven by his own greed. In sum, the defendant was involved in a large-scale fentanyl drug trafficking conspiracy that spanned at least seven months and involved six controlled buys of over 3,600 fentanyl and methamphetamine pills, which were video and audio recorded. On two additional occasions, the co-conspirators agreed to distribute an additional 1,200 pills (July 21, 2025 - August 1, 2025) and 2,500 pills (December 9, 2025 - December 15, 2025).

In sum, the drug quantities that the defendant sold were escalating, and there appeared to be no end in sight with respect to the defendant's desire to engage in criminal conduct. On the contrary, although the defendant was on probation during the instant offense and co-defendant Wellman was twice arrested during the course of this investigation (in February of 2024 and in July of 2025), the defendants were still undeterred from engaging in further criminal conduct. As

noted above, while co-defendant Wellman was detained on other charges in July and August 2025, he continued to work with defendant Mitchell and co-defendant Mullen to continue the fentanyl scheme. Within 24 hours of co-defendant Wellman's release from custody in August of 2025, co-defendant Wellman told a DEA UC that he and his supplier (defendant Mitchell) were prepared to supply him with 2,500 fentanyl pills, as well as greater quantities in future drug purchases.

**ARGUMENT**

**I. Nature and Circumstances of the Offense Charged**

The United States respectfully submits that the nature and circumstances of the charged offenses weigh heavily in favor of detention. The defendant's role in the seven month fentanyl drug trafficking conspiracy occurred against the backdrop of a widespread, lethal drug epidemic. According to the DEA, fentanyl "is similar to morphine but about 100 times more potent [. . . .] Because of its potency and low cost, drug dealers have been mixing fentanyl with other drugs including heroin, methamphetamine, and cocaine, increasing the likelihood of a fatal interaction [. . . .]" *See* DEA, Facts about Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl. Startingly, "two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage." *Id.* The lethality of fentanyl is reflected in nationwide statistics: roughly 82,020 people in this country died of drug overdoses in the 12-month period ending in October 2024. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts* (based on provisional data available as of March 2, 2025).[9] Of these deaths, roughly 51,010 (or about 62 percent) involved synthetic opioids (of which fentanyl is one). *Id.* (By comparison, in 2022, 46,728 people in the United States died of firearms. *See* JHU Bloomberg School of Public Health,

[9] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited March 28, 2025).

*Continuing Trends: Five Key Takeaways from 2023 CDC Provisional Gun Violence Data* (September 12, 2024)).[10] And, thanks in part to people like the defendant, our community has been pummeled by fentanyl: in 2022, Washington, D.C., had an opioid overdose death rate of 48.9 people per 100,000—third among all the states and D.C. only to West Virginia and Delaware. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2022 timeframe).[11]

In this case, defendant co-Wellman agreed to provide the CS fentanyl back in February of 2024, but was ultimately arrested before a scheduled controlled purchase could occur. This arrest, however, did not deter any of the defendants. In May of 2025, with the assistance of co-defendant Mullen and his supplier, defendant Mitchell, co-defendant Wellman jumped right back into distributing one of the most lethal drugs in drug trafficking history. There is absolutely no way to determine how many individuals overdosed from the defendants' fentanyl drug trafficking conspiracy, and how many family members of addicts were adversely affected by the defendants' ongoing criminal conduct.

## II. Weight of the Evidence Against the Defendants

The United States respectfully submits that the weight of the evidence against the defendants is overwhelming and weighs strongly in favor of detention. Over the course of seven months, the defendants worked together to sell fentanyl to a DEA CS and were prepared to sell 2,500 fentanyl pills to a DEA UC the day before their arrest. As detailed above, the drug transactions are memorialized in recorded telephone, jail, and/or FaceTime calls, text messages,

---

[10] https://publichealth.jhu.edu/center-for-gun-violence-solutions/2024/continuing-trends-five-key-takeaways-from-2023-cdc-provisional-gun-violence-data.

[11] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

audio and video recording of controlled buys, law enforcement surveillance that was recorded, communications between co-conspirators, and DEA laboratory analyses identifying the substance and weight.

## III. History and Characteristics of the Defendant

The United States respectfully submits that the defendant's history and characteristics also weigh in favor of detention. It appears that Pre-Trial Services did not fully document his criminal history, which is detailed more fully below.

On October 25, 2018, the defendant was arrested and charged with possession with intent to distribute illegal substances and possession of a firearm. He ultimately pled guilty to possession of marijuana over 10 grams, and, on May 30, 2019, he was sentenced to six months' probation (Baltimore County Circuit Court Case 03-K-18005049). On July 20, 2020, the defendant was arrested and charged participating in a criminal gang and possession of a firearm (Baltimore City Circuit Court Case 120204007). On December 21, 2022, the defendant was sentenced to five years imprisonment with two years and seven months suspended, and three years of probation. As noted above, there is a detainer lodged for violation of probation for this offense.

Moreover, during the course of the investigation, law enforcement never observed the defendant working for "Lawn CARE," as the defendant advised Pre-Trial Services, PSR at 2. Indeed, the business address provided by the defendant for the business is his home apartment. Defendant Mitchell was one of co-defendant Wellman's fentanyl suppliers, had ready access to large quantities of fentanyl, and showed no indication of ceasing his criminal ways even though he was on probation for a serious offense.

All of this strongly suggests that this defendant too has little respect for the law, for court directives, and shows no indication of future law-abiding conduct.

## IV. Danger to the Community and Risk of Flight

The government submits that the defendant poses a significant danger to the community as demonstrated by his continued criminal conduct while on probation for serious criminal offenses. It is also demonstrated by the fact that he failed to cease drug trafficking even when the defendants knew law enforcement were afoot (co-defendant Wellman told the CS on multiple occasions both he and defendant Mitchell were concerned about law enforcement presence; co-defendant Wellman detected law enforcement surveillance on June 5, 2025, but only one day later made another controlled buy; and counter-surveillance measures were taken by both defendants when driving to and at the controlled buys). In sum, the defendant was not in the least bit deterred by the concern of law enforcement presence or the threat of being arrested and went along with business as usual, all while being on court supervision.

The defendant is a clear danger to the community.

## CONCLUSION

For the reasons noted above, the government respectfully submits that no condition or combination of conditions will mitigate the defendant's danger to the community. Accordingly, the government respectfully requests that the defendant be detained.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By: _____/s/______________
Anthony Scarpelli
D.C. Bar No. 474711
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
202-252-7707 (Scarpelli)
anthony.scarpelli@usdoj.gov